# CHARLESTON.

STATE v. TONEY STAFFORD.

Submitted October 19, 1921.   Decided October 25, 1921.

1. INDICTMENT AND INFORMATION—*Indictment Not Quashed Where Grand Jurors Were Selected as Statute Required at Levy Term.*

   Prior to the legislature of 1919, the county court was required to prepare annually a list of grand jurors and deliver same to the clerk of the circuit court at its levy term which begins on the 2nd Tuesday in August and by operation of law is adjourned until the 4th Tuesday in that month, at which the levy must be laid as provided in sec. 2, chap. 28A, Barnes Code, 1918; and an indictment found and returned by grand jurors properly selected from such list so prepared either at the session begun on the 2nd Tuesday in August, or at the adjourned session begun on the 4th Tuesday of that month, should not be quashed for the alleged reason that such list was not prepared and delivered at the levy term. (p. 305).

2. HOMICIDE—*In Prosecution for Attempt to Murder, Instruction as to Guilt of Party Watching to Prevent Surprise of Those Doing the Shooting Held Sufficient.*

   An instruction given in a trial on an indictment for felonious attempt to kill, instructing the jury in effect, that if they believe from the evidence that the defendant, and others jointly indicted with him, all or any of them being armed with guns, went within shooting distance of a mine tipple and

cage then used for bringing men out of the mine and 'did, on a day named, lie in wait until certain persons named in the indictment came out of the mine in such cage, and that such other persons jointly indicted with defendant, or any of them, did then and there shoot with such guns at the persons coming out of the mine in such cage, with felonious intent then and there to kill·them, or any of them, and that defendant was then and there present or within about three hundred yards of such persons jointly indicted and watching to prevent surprise while such other persons were committing the offense, or with intention of giving assistance, should occasion arise,· to such other persons and was near enough to do so, then the defendant would be guilty of an attempt to commit murder in the first degree, sufficiently states a concerted design between defendant and those actually doing the shooting; and sufficiently states that defendant, by "watching to prevent surprise," was participating in the murderous intent.    (p. 307).

3.    CRIMINAL LAW—*Abstract Instruction Improper But will Not ·Require Reversal Unless it Has Misled Jury.*

An instruction which propounds an abstract proposition of law should not be given, but if given and there be evidence to which it is applicable, the appellate court will not reverse for that cause unless ·it is clear that the jury has been misled. (p. 309).

4.    SAME—*Instruction Correctly Defining Statutory Offense is Not Reversible on Theory of Assuming Facts not Proven.*

The giving of an instruction which correctly states a definition of a statutory offense for the violation of which defendant is indicted and being tried, is not reversible error on the theory that it assumes facts not proven, and thereby invades the province of the jury.    (p. 309).

5.    HOMICIDE—*Instruction That Verdict Must be Guilty of Attempt to Murder or Not Guilty, Proper, Where Lesser Offense Barred by Limitation.*

An instruction given in the trial of an indictment charging defendant with a felonious attempt to kill, "that under the law and the evidence in this case that they (the jury) can return only one of two verdicts; Guilty of an attempt to commit murder in the first 'degree, or not guilty," is properly given where the evidence is conclusive and uncontradicted that the offense, if any, was committed on the 16th day of November, 1917, and the indictment was not found and returned until the March, 1919,·term of the court; as all offenses lesser than attempt to commit murder in the first de-

gree have been barred by limitation before the finding of the indictment.  (p. 310).

6.  CRIMINAL LAW—*Court May Permit Attorneys Employed to Assist Prosecutor to Continue Trial in Absence of Prosecutor.*

Under sec. 7, chap. 120, Code, 1918, competent attorneys may be employed by any person to assist the prosecuting attorney in the prosecution of any person charged with crime; and if in the progress of a trial the prosecuting attorney is compelled by sickness or other valid cause to be absent from the trial, it is not error for the court, without objection on the part of defendant, to permit the attorneys so employed to proceed with the trial and prosecute the same to conclusion, unless it clearly appears that defendant was prejudiced thereby.  (p. 311).

7.  JURY—*Juror Held Competent Although Stating That He Did Not Think Much of Labor Unions, Where Defendant Belonged to One.*

A juror who on his voir dire says that he has no bias or prejudice against defendant because such defendant is an Italian, or is and was a member and officer of a labor organization at the time of the alleged offense, and that he could render a fair and impartial verdict from the evidence, regardless of the nationality of defendant or of the fact that he did or did not belong to a labor union, is a competent juror, although he also says that he "didn't think much of labor unions," and did not believe that labor unions were very conducive to law and order.  (p. 312).

Error to Circuit Court, Raleigh County.

Tony Stafford was convicted of attempting to kill by shooting, and he brings error.

*Affirmed.*

*C. M. Ward*, and *John M. McGrath*, for plaintiff in error.

*E. T. England*, Attorney General, *R. Dennis Steed*, Assistant Attorney General and *S. B. Avis*, for the State.

LIVELY JUDGE:

Defendant prosecutes this writ of error from a judgment of the criminal court entered on the 6th day of April, 1920, sentencing him to confinement in the penitentiary for five years.

At the March term in 1919, defendant, George Lucas, Tom McGinnis, Dorr Snuffer, Tom Murphy, Ed. Hornick, Will Owens, Tom Lethco, Toney Sorazzo and Carl Crim were jointly indicted for a felony, the indictment charging them with unlawfully and feloniously attempting to maliciously, deliberately and unlawfully kill John Ransom and others by shooting at them with guns on the 16th day of November, 1917. Some of the defendants demanded separate trials and the State elected to try Toney Stafford.

In October, 1917, the E. E. White Coal Co. had a controversy with some of its employees, at the Glen White mines, who were members of the United Mine Workers of America, and a strike resulted, the company's employees who were not members of the union remaining at work. The dispute was decided against the strikers by the United States mediators, and thereafter occurred the shooting for which defendant and the persons named above were indicted. The state's evidence was to the effect that Toney Stafford, who was an organizer of the United Mine Workers, suggested to Tom McGinnis, the secretary of the miners' local at Glen White, after the decision of the mediators had been rendered, that some radical means would have to be employed to win the strike; that Stafford later proposed that he furnish the guns and McGinnis the men to shoot at the nonunion miners when the cage, in which they were carried up the mine shaft at the close of the day's work, appeared at the surface; that in pursuance of this arrangement Stafford did furnish a number of high powered guns and ammunition; and that on the afternoon of November 16, 1917, defendant Stafford, together with Tom McGinnis, George Lucas, Dorr Snuffer, Carl Crim, Tom Murphy, Will Owens and others assembled on the mountain side, where the guns and ammunition had previously been hid, and lay in wait within shooting distance until the men at work came up in a cage; that from fifty to three hundred shots from high powered rifles were fired at a cage containing, among others, John Ransom, John Spears and H. E. Nuckolls, the bullets striking all around the men but hitting no one. Witnesses testified that Toney Stafford, defendant, was armed with a shot gun and stationed about 300 yards behind the

other men for the purpose of watching to prevent surprise and to give assistance if needed. There was no direct proof that he fired any shots, but witnesses stated that he was the only one armed with a shot gun and that buck shot had been fired, also that paper shells were found on the mountain side the day after the shooting. Tom McGinnis, Dorr Snuffer, George Lucas and Carl Crim, as witnesses for the State, confessed their participation in the shooting, admitted that they shot at the men in the cage to kill them, and stated that such was the advice given to them by defendant Stafford. They also testified as to Stafford's connection with the plans which resulted in the shooting. Stafford denied that he had anything to do with the arrangements leading up to the shooting and testified that he was in the town of Beckley, about seven miles distant, when it occurred. Several witnesses for defendant testified that Stafford was seen by them in Beckley at different hours during the day of the shooting and others stated that they did not see him at the meeting hall of the Glen White local union on that day.

Many assignments of error are made, but six only are urged, and to these we will confine our consideration.

On October 6, 1919, defendant filed two pleas in abatement to the indictment, averring that the grand jury which had found and returned the indictment had not been selected from a list of grand jurors prepared by the county court in the manner prescribed by law. The court, without objection or exception, proceeded to try the issue joined on these two pleas, and found in favor of the State. Error is assigned because the court so decided. The State objected to the filing of these pleas on the ground that they were tendered by defendant alone, and were not sworn to by him, but by one Lawrence Dwyer, citing *Rader* v. *Adamson*, 37 W. Va. 582. It is not necessary to decide this contention, in view of the disposition we make of this assignment of error. Section 2, chap. 157, Code, 1918, directs that the county court shall at its levy term annually prepare a list of not less than 100 nor more than 150 freeholders, qualified to serve as grand jurors, and deliver the list so prepared to the clerk of the circuit court, from which grand jurors shall be drawn at the time

and in the manner therein set out.    Defendant alleged and
sought to prove that the grand jury which found and return-
ed the indictment was not selected from the list so prepared;
that the county court did not prepare such list at its levy
term; that on the contrary it prepared such list and delivered
the same to the circuit clerk on September 4, 1918 at a special
term of the county court.    When is the levy term of the
county court?  This is the controlling question raised by
these pleas.    Section 1 of chap. 28 A, Code, 1918 (the chapter
on tax levies) requires the county court to hold a session on
the second Tuesday in August in each year, then make up its
budget and ascertain the total amount necessary to be raised
by the levy for the current year, the assessed value of the
property subject to taxation, and the rate of levy proposed
on the property as a whole, and publish the statement in two
newspapers.    The session shall then stand adjourned until
the 4th Tuesday in August, at which time it shall convene,
hear objections to the estimate and proposed levy, if any,
and lay the levy.    It appears that the court did meet, as re-
quired, on the 2nd Tuesday in August, 1918; that it was in
special session on August 21, when it called a special session to
meet on the 27th day of August, 1918,  for the purpose of
transacting certain items of business named in the call, and,
in pursuance thereof, did meet on the 27th and continued in
session from day to day until the 4th of September, and dur-
ing which time it laid the county levies,  and on which last
named day it prepared a list of grand jurors and delivered
the same to the circuit clerk in strict accordance with sec. 2,
chap. 157, Code, 1918.    It is clear that the session directed to
be held on the 2nd Tuesday in August with adjournment over
until the 4th  Tuesday  in  the  same  month  constitutes
the levy term, within  the  meaning  of  the  require-
ment that the list of  grand  jurors  shall  be  prepared
at  the  "levy  term."    The  beginning  of  the  levy
term  is  on  the  2nd  Tuesday  in  August  and  by  op-
eration of law continues (with the adjournment) until such
time after the 4th Tuesday as the business shall have been
finished and the session closed.    A list of jurors prepared
and delivered on any day of this session so beginning and
ending would be "at the levy term."    It does not make any

difference that a special term was called for "Monday, the 27th day of August" ("the 27th" is apparently an inadvertence) ; the court was in session on the day following, the 4th Tuesday, as required by statute, and considered and laid the county and district levies. Nor is it of importance that the purposes for which the special session was called to meet on Monday did not include the item of preparation of the grand jury list, nor that the call was improperly or properly posted. The court could not make the regularly adjourned session held on the 4th Tuesday (the 27th) a special session by naming it such; nor prevent it from being the levy session by giving it any other name.   The statute governs in that.

Defendant's second assignment of error relates to the giving of the State's instruction No. 5, which is as follows: ":The court instructs the jury that if they believe from the evidence that on the 16th day of November, 1917, that Tony Stafford, Carl Crim, Dorr Snuffer, Tom McGinnis, Tom Murphy, Tony Sarazzo, George Lucas, Will Owens, Ed Hornick, Tom Lethco, or either or all, or any of them, armed with rifles, guns and pistols, loaded with powder and leaden and steel balls and bullets, did go within range and shooting distance of the tipple of the Glen White mines, in which was the cage that is used for bringing men up out of said mine, and the said Carl Crim, Dorr Snuffer, Tom Murphy, Tony Sorazzo, George Lucas, Will Owens, Ed Hornick and Tom Lethco, did then and there lie in wait until John Ranson and the other persons mentioned in the indictment   in this case came up on said cage, and did then and there shoot at the said John Ranson and said other persons mentioned in the indictment, or either, or any, or all of them, with said rifles, guns and pistols, loaded as aforesaid, with intent then and there to kill them, or either or any or all of them; and if the jury believes from the evidence that the said Tony Stafford was then and there present or within about three hundred yards of the said Carl Crim, Dorr Snuffer, Tom Murphy, Tony Sorazzo, George Lucas, Will Owens, Ed Hornick and Tom Lethco, and watching to prevent surprise whilst said Carl Crim, Dorr Snuffer, Tom Murphy, Tony Sorazzo, George Lucas, Will Owens, Ed Hornick and Tom Lethco were on the

hillside committing said offense, or with the intention of giving assistance, should occasion arise, to the said Carl Crim, Dorr Snuffer, Tom Murphy, Tony Sorazzo, George Lucas, Will Owens, Ed Hornick and Tom Lethco, and was near enough to afford it should the occasion arise, then the court instructs the jury that the defendant, Tony Stafford, would be guilty of an attempt to commit murder of the first degree.'' It is claimed that this instruction makes the defendant guilty if he was present or near and watching to prevent surprise or with the intention of giving assistance, regardless of whether those who did the shooting knew of his presence or purpose. The mere presence of one at the scene where there is an attempt to kill by another or others is not sufficient to make him a principal in the act; there must be some conduct on his part by which he encourages, incites or abets the attempt to kill. A mere negative acquiescence in the act, unknown to the principal, is not sufficient. But if there is preconcert and design, then his presence, although not accompanied by any overt act, would make him equally guilty with the person committing the act. His presence with preconcert would incite and encourage the commission of the offense, as the actual perpetrator would likely rely upon active assistance if it should become necessary. But this instruction is based on active participation by defendant in the commission of the crime. If he was ''watching to prevent surprise'' or with the intention of giving assistance, and was near enough to do so, he was an actual participant. If the others were lying in wait to do shooting, he was also lying in wait to prevent surprise and was thus actively aiding, abetting and participating in the crime. Can it be questioned that defendant did not know the intent and design of those who did the shooting ? If, under this instruction, the jury believed that defendant was present or within 300 yards of the others, who were firing high powered guns at men emerging from a mine, with intent of killing them, and was there for the purpose of preventing surprise or giving aid, would it not irresistibly follow that he knew the purpose of the shooting, the intent and design of those participating therein? If he was there for the object set out in the in-

struction he was a particpant in the murderous design. More-
over, the instruction includes defendant as one of the number,
who, being armed with loaded guns, went within shooting
distance of the mine on the 16th of November, 1917, and while
it does not in terms state preconcerted action, or knowledge
of defendant's presence when the shooting began, (if that
should be necessary where he actually participated) the in-
ference of common design and action is so apparent, that the
jury could not have been misled.     Where two or more per-
sons, acting with a common intent, jointly engage in a com-
mon undertaking and jointly commit an unlawful act, each
is guilty of the offense committed to the same extent as if he
were the sole offender.     Each is responsible for the acts of the
others.     16 C. J. p. 128, title, "Criminal Intent and Com-
munity of Unlawful Purpose."     Where the accused com-
mits any act which facilitates the commission of the offense, it
is not necessary that the perpetrator should know that the ac-
cused intended to render or had rendered assistance. *State* v.
*Talley,* 102 Ala. 25.     In order to show a community of un-
lawful purpose, it is not necessary to show an express agree-
ment or an understanding between the parties.     *Gibson* v.
*State,* 89 Ala. 121; *Howard* v. *Commonwealth,* 96 Ky. 19.     A
conspiracy or common purpose may be inferred from the cir-
cumstances.     Preconcert may be shown by circumstances as
well as by direct evidence.

The giving of the State's instruction No. 6 is objected to on
the ground that it states an abstract proposition of law, and
was calculated to lead the jury into the belief that the trial
court believed the defendant guilty of an attempt to commit
murder in the first degree.     It is in the following words:
"The court further instructs the jury that under the law of
this State any wilful, deliberate and premeditated killing of
a human being by another is murder of the first degree, and
that any felonious, wilful, malicious, deliberate and unlawful
attempt by one human being to take the life of another is an
attempt to commit murder in the first degree."     It is well
settled that abstract propositions of law should not be given
when there is no evidence on which they can be predicated;
but where they are given, and there is evidence in the case to

which they are applicable, but no particular reference is made to the evidence in such instructions, it will be presumed that the jury made the proper application.    *State* v. *Long,* 88 W. Va. 669, 108 S. E. 279; Blashfield's Inst, to Juries, sec. 432, p. 973.  · There was sufficient evidence in this case to support the verdict.    To support the contention that the instruction would lead the jury into believing that the trial court believed the defendant guilty of an  attempt to commit murder in the first degree, an instruction given in *State* v. *Allen,* 45 W. Va., 65, is relied upon, and is as follows: ''The Court instructs the jury that previous threats or acts of hostility however violent they may be, will not justify a person in seeking and slaying his adversary.''    This instruction was held bad because it assumed certain things as facts, namely, the seeking and slaying of deceased by defendant, and intimated to the jury what the judge believed the evidence to be touching those facts.    A comparison of the two instructions shows that the objectionable elements in the instruction in the Allen case are not found in the instruction now under consideration.    In no portion of the instruction does the court single out any fact peculiar to this case, as was done in the Allen case, and in *People* v. *Strong,* 30 Cal. 151, and *Whitely* v. *State,* 38 Ga. 50, cases cited to support the opinion in the Allen case.    The first portion of the instruction gives in substance the statute relating to first degree murder as found in sec. 1, chap. 144 of the Code, as far as that statute has any application to this case, and the latter part merely defines an attempt to commit murder in the first degree.    Taken as a whole, the instruction is proper as one defining the crime of an attempt to commit murder in the first degree.    *State* v. *Clark,* 64 W. Va. 637; *Longley* v. *Comm.,* 99 Va. 807; 16 C. J. sec. 2362; *State* v. *Ireland,* 72 Kan. 265.    It cannot be construed as indicative of belief in the guilt of the accused by the trial judge.    Shall we say that a correct definition of a crime indicates that the trial judge who gives it in an instruction believes the defendant is guilty, where it assumes no facts as proven?

Assignment of error is based on the giving of instruction No. 8 for the State, which reads:    ''The court instructs the

jury that under the law and the evidence in this case that they can return only one of two verdicts:—Guilty of an attempt to commit murder in the first degree, or not guilty.'' Ordinarily this instruction would be incorrect and compel reversal. When there is a verdict for murder, the jury must fix the degree thereof.       Sec. 19, chap. 159, Code, 1918; *Burton* v. *Commonwealth,* 108 Va. 892; *State* v. *May,* 62 W. Va. 129. It is argued that if the intention was to kill then the crime would be an attempt to commit murder in the first degree, no one having been killed; but that if the intention was to cripple, the crime would be attempt at murded in the second degree; and if simply to scare, then the attempt would be to commit an assault.   This is correct; but when we turn to the punishment for attempts we find that if the offense attempted be punishable with death, then the person making such attempt shall be guilty of a felony and confined in the penitentiary not less than one nor more than five years; but if the offense be punishable with confinement in the penitentiary, then the person attempting shall be guilty of a misdemeanor.       Sec. 9, chap. 152, Code.   The evidence is conclusive and uncontradicted that the attempt was committed on 'November 16, 1917; and the indictment was found and   returned at the March term, 1919, more than one year from the time of the commission of the offense; hence, the misdemeanor under this indictment had been barred by limitation; and á verdict for less than an attempt to commit murder in the first degree would have been equivalent to a verdict of not guilty.   It would have discharged the prisoner.   Under this indictment, and the law and evidence, it was not error to give this instruction.

Error is assigned because, it is asserted, the prosecution was inspired, managed and controlled by employed counsel; and that neither the prosecuting attorney nor his assistant were present or participated in the trial.   The record does not bear out this assignment.   M. L. Painter, the prosecuting attorney, appeared at the preliminary examination of defendant before a justice of the peace, summoned witnesses before the grand jury and examined them, participated in and controlled the preparation of the indictment, was present

and actively engaged in the conduct of the first trial, which resulted in a hung jury; was present at the beginning of this trial, struck from the jury of twenty those jurors required to be struck off by the prosecution, and was present and giving active attention to the trial up to the time when he received a telegram which called him to Richmond, Va. to attend the fatal illness of his wife in a hospital in that city.    We think the record shows sufficient participation of the prosecution in the inception, preparation, conduct and trial of the case to fully overcome this assignment of error; and that the court committed no prejudicial error in permitting the trial to proceed under the management of special counsel after the prosecuting attorney was called away to attend his dying wife. *Jackson* v. *Commonwealth,* 96 Va. 107.    We find no objection made to the absence of the State's attorney, or to the participation of employed counsel in the case, until after the verdict, and we cannot see wherein the defendant has been prejudiced.    The objection should have been made when the prosecuting attorney was called away.

The remaining assignment of error is predicated on the refusal of the court to sustain a peremptory challenge of defendant to Howard O'Neal, a juror selected on his voir dire on the panel of twenty.    Upon an extended and thorough examination of this juror, both by the prosecution and defense, it developed that he had no bias or prejudice against defendant, either on account of his nationality or because he was a member of the United Mine Workers, a labor union, and had no bias or prejudice against him for any other cause, and that he could go upon the jury and render a fair and impartial verdict according to the evidence.    However, he stated that he "didn't think much of labor unions," and did not think such unions very conducive to law and order. This juror was at that time loading coal at another coal operation at Pemberton, several miles distant from the Glen White mine, at which first named coal operation a strike had been in progress a year or so before, when he had continued to work, being a non-union workman and not knowing what the strike was about.    The court, upon objection, refused to permit him to answer two questions, both of which asked in sub-

stance that if it developed upon the trial that there was a
strike at the Glen White mines at the time of the offense, and
that the union miners including defendant, who was an officer
in the union, were not working and the non-union members
were working, would these facts influence his mind to some
perceptible degree in arriving at the innocence or guilt of the
accused.    It was evident that these questions in substance
had been repeatedly answered in the negative by the juror,
and the court desired to put an end to repetition.    To illus-
trate, he was asked:    ''Would you have any bias or prejudice
against this defendant, Tony Stafford, by reason of the fact
that he was a member and an officer of the    United Mine
Workers of America, at Glen White at the time of this strike,
and during the time of the shooting?''    Answer: ''Well, I
don't know as it would.''    Question: ''Mr. O'Neal, if you
were selected as a juror in this case, do you feel that you could
go into the jury box, and would do so, and render a fair and
impartial verdict from the evidence, regardless of the na-
tionality of the person on trial, or whether they belonged to
a Union or did not belong to a Union?''    Answer:    ''Ac-
cording to the evidence, I believe I could.''    The only criti-
cism, if any, which could be made of this juror is that    he
did not have a high regard for labor unions as conducive to
law and order.    The judge aptly remarked that it would be
difficult to find a man in the county who did not believe or did
believe in labor unions, and if that rule was adopted as a
basis of selection it would be impossible to obtain a jury.
The labor union was not on trial, simply one of its officers
and members who had been indicted for the alleged commis-
sion of a crime.    It would be difficult to obtain a jury to try
a person charged with exhibiting and operating a gambling
device, if all who did not believe such operations were con-
ducive to law and order were excluded.    It is not meant to
compare labor unions with the gambling fraternity, but only
to illustrate.    We pause here to say that labor unions are
lawful organizations, and, where properly conducted, have
been of great benefit to their members, and have accomplished
beneficent designs.    Defendant was entitled to a panel of
twenty jurors, free from bias and prejudice, with minds free

to render an impartial verdict. It does not make any difference that this particular juror was struck off and was not one of the twelve who returned the verdict. *State* v. *Dushman,* 79 W. Va. 747; *Dowdy* v. *Commonwealth,* 9 Grat. 727. But upon a careful review of the questions propounded to, and answers given by this juror upon his voir dire, we concur with the trial judge in the conclusion that he was a competent juror.

The general assignment that the court erred in refusing to set aside the verdict and grant a new trial impels us to examine the evidence. It is enough to say that defendant's whole defense rested upon an alibi. Four witnesses, Tom McGinnis, George Lucas, Carl Crim and Dorr Snuffer, jointly indicted with defendant, and who participatel in the shooting, testified that defendant had originated the plan, was present at its execution and directing its progress. There were circumstances and other evidence tending to corroborate them. Eight witnesses, and perhaps more, testified that defendant was at Beckley on the day of the shooting and could not have participated in the actual execution of the crime. Upon this question of fact the jury has passed judgment, and we will not disturb its finding.

Perceiving no error, we affirm the judgment and sentence of the lower court.

*Affirmed.*