I am authorized to state that McGRAW, J., joins me in this dissent.

STATE OF WEST VIRGINIA

*v.*

NOLAN ERVIN TOPPINGS

(No. 14144)

Decided December 2, 1980.

*John C. Valentine, Valentine, Wilson & Partain,* for plaintiff in error.

*Chauncey H. Browning,* Attorney General, *Curtis G. Power, III,* Assistant Attorney General, for defendant in error.

PER CURIAM:

The appellant, Nolan Ervin Toppings (hereinafter appellant or defendant), was convicted by a jury of entering without breaking in the Circuit Court of Logan County and now appeals from a June 14, 1977, final order overruling his post-trial motion to set aside the verdict and grant a new trial.

Although the appellant assigns numerous errors in support of his contention that this Court should reverse his conviction, we reverse and award a new trial exclusively on the ground that the State was permitted to impeach the defendant's credibility by cross-examining him regarding a previous burglary conviction in violation of our pronouncement in *State v. McAboy,* 160 W.Va. 497, 236 S.E.2d 431 (1977).

The State concedes that appellant's *McAboy* rights were violated by requiring him to testify on cross-examination that he had been previously convicted of burglary. The state argues, however, that reversal is not required because the error was harmless, citing *State v. Atkins,* 163

W.Va. 502, 261 S.E.2d 55 (1979). The State contends that in view of the evidence at trial, the error in admitting the defendant's prior conviction must have played little or no part in the State's case and must have had a minimal impact on the jury. They also point out that the prosecution was not allowed to embellish on the conviction by specifying details and that the jury was instructed the prior conviction could only be considered in regard to the defendant's credibility as a witness. We are unable to agree with the State that the error must have had little or no impact on the jury.

In *Atkins* this Court traced the history and evolution of the harmless error doctrine and formulated the analytical framework for applying the harmless error rule which we must apply to the evidentiary error in this case. Its second syllabus reads:

> Where improper evidence of a non-constitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.

We now apply this test to the instant case. When the inadmissible evidence is removed from the State's case and the remaining admissible evidence is viewed in the most favorable light, it is clear that there was sufficient evidence adduced to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. Syl. pt. 1, *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978) (standard of review for sufficiency of evidence on appeal). As our review of the evidence later in this opinion demonstrates, there was direct evidence that the defendant removed boxes from the house in question and placed them in his car. This property, later identified as being stolen from the house,

was found in the defendant's car. Since we conclude the remaining evidence is sufficient to support the conviction, the question that must be addressed is whether the *McAboy* error had a prejudicial effect on the jury.

*Atkins, supra,* identifies several pertinent considerations in making the admittedly difficult harmless error evaluation, including the remoteness of the prior conviction, whether a limiting instruction was given, whether the prior conviction was singled out or emphasized, and the quality of the State's proof. An appraisal of the prejudicial impact of a *McAboy* violation on the jury also requires us to consider the probative value of the erroneously admitted criminal conviction on the defendant's credibility as well as the risk of substantial prejudice to the accused by its admission. We begin our inquiry with a review of the evidence adduced at trial.

The theft offense occurred at a vacant Logan County residence located in the small residential community of Big Creek, Logan County, at about 10:00 p.m. on August 13, 1974, some two and one-half years prior to the trial. The principal State's witnesses were a man and his teenage son who resided next door to the vacant residence. The son testified that as he was returning home that night he heard noises coming from the vacant residence. He informed his father and together they proceeded to the front porch of their house to investigate what was occurring. Both witnesses testified that they heard noises and saw a light coming from the house; that their house sat back from the road farther than the vacant house, giving them a restricted view of the building such that they could not actually see the front of the house and could only see a portion of the porch; that they saw the legs of two persons coming out a front window in the house; that they saw two men standing on the porch but were unable to identify them at this point; that the two men then ran across the street, carrying boxes and perhaps a suitcase, and turned and continued running past the front of their house to a car parked forty or fifty feet on the far side of their property; that as the two men were in front of their house they were able to identify them as being the defendant and his

brother; and that they also recognized the car as belonging to the defendant.

Although these witnesses testified they saw the defendant and his car at the scene of the crime, their testimony did not go unchallenged. Both witnesses testified in a previous trial involving the appellant's brother. Their former testimony was used by defense counsel to impeach their credibility. The conflicts in their present and former testimony weakened the force of their testimony. For example, both witnesses testified they were able to see the feet of the individuals as they came out of a window in the house, but they did not so testify at the first trial. Indeed, one of the witnesses testified previously that he could not see anyone come out the window from where he was standing. Both witnesses were also impeached concerning what they saw being taken from the house. And one witness said he saw the defendant only once that night, but in the first trial he said he saw the defendant twice.

The trial testimony also raises a question as to whether their identification was accurate. The distance between the eyewitnesses and the defendant at the point where they indicated recognizing him was at least forty to fifty feet away. It was dark in a small rural community without significant lighting. One defense witness described the area around the vacant house as being "real dark." From the testimony of the eyewitnesses it appears that neither of them had a frontal view of the individuals. In fact, one of the witnesses admitted telling defense counsel that he did not see the faces of the individuals who ran from the next-door residence, but attempted to explain away his prior inconsistent statement to the defendant's lawyer by saying he did not know who the attorney represented at the time he made the statement.

It is indisputed that boxes and various household effects including a suitcase, table, lamps and various items of clothing were found in the rear seat of the defendant's car. The defendant, however, offered a defense which would explain this circumstance in a manner consistent with his innocence.

The defendant testified that on the night in question he parked his car a few feet off of the highway and walked a considerable distance to go fishing in a nearby stream underneath a railroad trestle. He fished from approximately 6:00 p.m. until roughly 10:00 p.m. He often fished at night since he believed that fishing conditions were best then. Upon walking back to get his car, he found it missing and immediately began to walk back toward the Big Creek residential area seeking assistance. There, near a carry-out grocery, he was able to flag down a ride to his father's home from a person he knew. From there he made a phone call to the State Police Headquarters reporting that his car had been stolen. On cross-examination by the State, the defendant admitted that he had been convicted of burglary in Logan County in 1971.

In support of this version of the facts, the defense called a witness who corroborated the defendant's story, testifying that appellant flagged him down at the grocery store, told him his car had been stolen while he had been fishing, and requested a ride to his father's house so he could telephone the state police. He said he drove appellant to his house, waited for him outside in the car for about fifteen minutes, and then drove him back to the grocery store. He further testified that the appellant indicated he was going to try to find someone to drive him around in hopes of locating his stolen vehicle. The defense called another witness who testified that he lived near the grocery store and at about 10:00 p.m. that night the defendant stopped by his house asking for assistance in finding his car which he said had been stolen. He provided that help, driving the defendant about two miles down the road where they located the car, wrecked with its rear end obstructing one lane of traffic. The defense also called the defendant's mother who corroborated the fact that the defendant said his car had been stolen that night and that he had asked to use their phone to contact the state police.

From this review of the evidence, particularly the testimony and circumstances surrounding the identification of the defendant, it is apparent that the State's case cannot be fairly characterized as overwhelming as was the

case in *Atkins*. It is also clear that the defendant's credibility was an important issue in this case. If they believed him and his alibi witnesses they would be required to find him innocent. These circumstances also differentiate this case from *Atkins*. There the defendant did not deny the killing but claimed self-defense despite physical evidence showing the victim had been shot five times in the back. Even in *Atkins*, we admonished that "[a] prosecutor acts at his peril in violating *McAboy,* and the case will be reversed unless a clear showing can be made that it meets the stringent harmless error standards set out in this opinion." [*Id.* 261 S.E.2d at 63].

Our *McAboy* decision recognized that crimes other than perjury and false swearing are not directly related to a defendant's credibility. *McAboy's* central point was that evidence of a prior conviction creates a prejudicial inference in the jury's mind that since the defendant had in the past broken the law this might influence them to believe that he was guilty of the crime charged in the present case.

Here the defendant was impeached by a conviction for the same or substantially the same offense as the felony for which he was on trial. There is an obvious and special danger of prejudice present when the impeaching conviction is for the same offense on trial because of the increased risk that the jury, and understandably so, will consider the evidence on the substantive question of guilt or innocence—if he did it before he probably did it this time—rather than just as effecting his credibility. *See,* e.g., *Gordon v. United States*, 383 F.2d 936 (D.C. Cir. 1967).

In conclusion, after a careful consideration of all the circumstances present in this case, we cannot say that the State met our stringent harmless error standards established in *Atkins*, and for this reason the case must be reversed and remanded for a new trial.

*Reversed and remanded;*
*new trial awarded.*