# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 19-1050** (Marshall County 19-F-40)

**Joshua Michael McWhorter,**
**Defendant Below, Petitioner**

**FILED**
**December 16, 2020**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Joshua Michael McWhorter, by counsel Justin M. Collin, appeals the Circuit Court of Marshall County's October 23, 2019, sentencing order following his convictions for strangulation, four counts of domestic battery, and unlawful restraint. Respondent State of West Virginia, by counsel Scott E. Johnson, filed a response. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On January 26, 2019, an argument between petitioner and his then-girlfriend D.J.,[1] who was fourteen weeks pregnant, turned physical when petitioner restrained D.J., strangled her, threw her down repeatedly, and put his hand over her mouth so that she could not yell for help. After the incident, D.J. went to the hospital where doctors determined that her fetus was unharmed.

Petitioner was indicted on one count of strangulation, four counts of misdemeanor domestic battery, and one count of misdemeanor unlawful restraint. D.J. was the alleged victim of the strangulation and unlawful restraint charges and of two counts of domestic battery. The remaining

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *In re Jeffrey R.L.*, 190 W. Va. 24, 435 S.E.2d 162 (1993); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

two domestic battery charges identified the fetus as the victim, under the Unborn Victims of Violence Act, West Virginia Code § 61-2-30 (the "Act").[2]

At the September 12, 2019, pretrial conference, the State moved, under Rule 404(b) of the West Virginia Rules of Evidence, to introduce evidence of an incident of domestic violence between petitioner and his current girlfriend S.Z. that occurred after petitioner posted bond in this matter.[3] The State called S.Z. at the pretrial conference, who acknowledged that she posted pictures of her bruised and bloodied face to social media and claimed that petitioner had caused the injuries. S.Z. also recounted that D.J., presumably after seeing the social media posts, reached out to S.Z., and S.Z. told D.J. that petitioner had caused the injuries. S.Z. claimed at the pretrial conference, however, that she was lying to D.J. and on social media and that she inflicted the injuries upon herself.

Robert Duncan, an officer employed by the Martins Ferry, Ohio, police department, testified at the pretrial conference that he went to S.Z.'s home after viewing the photographs and statement S.Z. had posted to social media. Officer Duncan's interview of S.Z. was recorded on his body camera. In that interview, S.Z. admitted that petitioner had caused her facial injuries and, during the incident, would not allow her to leave.

The State sought to introduce the evidence in relation only to the domestic battery and unlawful restraint charges to show a common scheme or plan and the absence of mistake. The State argued that the common scheme was that petitioner "is in a romantic relationship with these two girls [S.Z. and D.J.] A domestic incident happens and he doesn't allow them to leave the house or call the police on both occasions."

The court found sufficient evidence to believe that petitioner committed domestic battery against S.Z., and it allowed the State to call her as an adverse witness during its case-in-chief, to call Officer Duncan, and to play only that portion of his body camera footage it deemed was not unduly prejudicial.

Petitioner's trial began on September 18, 2019. Regarding the incident giving rise to the charges against petitioner, D.J. recalled "being shoved a lot to the ground and [petitioner's] hands around my neck until I couldn't really see. I saw like white dots." D.J. testified she was thrown to the ground "multiple times." D.J. also said that, each time she attempted to leave the room she and petitioner were in, petitioner would push her to the ground.

While petitioner had his hands around her neck, D.J. could not breathe and "felt like [she] was about to pass out." D.J. further recounted that petitioner, after he realized she could not

---

[2] The Act designates a fetus as a "separate and distinct victim[]" for the purposes of enforcing certain statutes. W. Va. Code § 61-2-30(c).

[3] Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But, the evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." W. Va. R. Evid. 404(b)(2).

breathe, stopped choking her and helped her breathe again, only to then resume choking her. D.J. vomited in a trashcan during the incident. When D.J. tried to yell for help, petitioner put his hands over her mouth and told her to "shut up."

D.J. also testified that, during this encounter, petitioner used her phone to leave threatening responses to individuals who had messaged D.J. through social media. D.J. stated that she cried and begged to go to the hospital while petitioner was leaving these messages, but he would not allow her to and continued to push her or "pick [her] up physically and put [her] back in the room." D.J. pleaded with petitioner to return her phone "so [she could] go to the hospital and make sure the baby is okay." Petitioner eventually returned D.J.'s phone when he instructed her to call her mother to notify her that D.J. was going to stay with him at his grandmother's house. While talking with her mother, D.J. stated that she believed she needed to get her unborn child evaluated at the hospital. This enraged petitioner, who directed D.J. to call her mother back to tell her she was fine and that she would take an over-the-counter medication. D.J.'s mother, unconvinced, said she was coming over to check D.J.'s blood pressure.

D.J. further testified that, when petitioner learned that D.J.'s mother was coming over, he made her put on a hooded sweatshirt to cover the marks around her neck and told her to stop crying so that D.J.'s mother would not know that something was wrong. Once D.J.'s mother arrived at the house and determined that D.J.'s blood pressure was elevated, petitioner allowed D.J. and her mother to leave.

D.J. said she went to the emergency room and informed hospital staff that she wanted to report the domestic violence incident to the police. In addition to taking D.J.'s statement, the responding police officer, West Virginia State Trooper William Beck, took photographs of a cut on D.J.'s mouth, a bruise under her eye, and marks around her neck.

D.J. also testified to the online conversation she had with S.Z. regarding S.Z.'s injuries allegedly inflicted by petitioner. The court instructed the jury, in part, that the jury could not consider the evidence "as any proof of the charges contained within the indictment," but the jury "may consider it to show absence of mistake, lack of accident, plan or intent."[4]

D.J.'s mother testified that she took her daughter to the emergency room after determining that D.J.'s blood pressure was elevated. While at the hospital, D.J. disclosed to her mother what petitioner had done, and D.J.'s mother observed marks on D.J.'s face, neck, and chest.

Trooper Beck also testified, and he described seeing marks on D.J.'s neck and face when he arrived at the hospital. As part of his investigation, he listened to the messages petitioner left for others from D.J.'s phone. Trooper Beck noted that "it sound[ed] to [him] that [D.J.] was crying in the background." Trooper Beck also obtained a statement from petitioner, in which he admitted to attempting to contact D.J. while she was at the hospital, to taking and looking through her phone,

---

[4] In its charge to the jury, the court again instructed the jury as to the permissible uses of the Rule 404(b) evidence regarding S.Z.

and to messaging others. Petitioner also admitted that things got physical between him and D.J. The State played D.J.'s recorded statement for the jury.

Dr. Christopher O'Neal, the emergency room physician who evaluated D.J. and her fetus, testified that, when he examined D.J., it "appeared that she had been in an altercation recently" as she had some redness and "swelling . . . just under the right eye" and bruising on her chest and neck. D.J. also expressed to him that "[s]he was concerned that she had struck her abdomen at some point during either the altercation or fall." Dr. O'Neal performed a bedside ultrasound and determined that D.J.'s fetus was uninjured.

After the State rested, petitioner moved for judgment of acquittal on the two domestic battery counts pertaining to D.J.'s fetus. Petitioner argued that because the fetus was uninjured, and because the statute specifies that a fetus is a separate and distinct victim, the State's evidence could not support convictions on those counts. The State responded that domestic battery could also be committed by physical contact of an insulting or provoking nature and that petitioner "only had to make physical contact with [D.J.] of an insulting or provoking nature for that child to also have been physically contacted in an insulting or provoking nature." The State argued that "the strangulation, throwing [D.J.] down and putting his hand over her mouth are injuries that would have [a]ffected a fetus inside of [D.J.]"

The court asked, "So your argument, . . . is by a domestic battery, what legally constitutes a domestic battery on the woman is essentially strict liability as domestic battery on the fetus." The State responded, "Essentially, your Honor, coupled with the fact that the [petitioner] knew she was pregnant before these actions took place." The court agreed with the State: "I think the intent of the statute basically . . . touch a pregnant woman with a fetus that constitutes a domestic battery on her, it also at the same time, the same act constitutes a domestic battery on the fetus. I think that's the intent of the legislation."

During petitioner's case-in-chief, he painted a very different picture of the altercation with D.J. He testified that, after purportedly finding "things [he] didn't want to see" on D.J.'s phone, he told her that he "no longer wanted to be with her." Scared of raising the baby alone, D.J. "started going crazy, screaming and crying, and she was hyperventilating. She was dry-heaving, because she was having an emotional breakdown." Petitioner admitted to having said "very unnecessary things to her," to being angry enough to hurt someone, and to "verbally abusing her and being very rude," but he denied choking D.J. or pushing her down. Petitioner claimed, instead, that he "had to take a hammer out of [D.J.'s] hands because she threatened to hit [him] with it if [he] did not give her back her cell phone." Petitioner explained D.J.'s documented injuries by claiming that she "has been known to hurt herself on multiple occasions" and suggested, too, that D.J.'s "parents help[ed] her [harm herself] on the way to the hospital, because she was so upset with me." In an apparent reference to S.Z.'s claims of self-harm, petitioner said, "I don't know what it is with me, but I get with females that are like that."

In regard to his statement to Trooper Beck that things got physical, petitioner explained that the altercation "wasn't . . . physical in the way of trying to harm her. It was physical in a way of trying to comfort her and calm her down. I hugged her, and I put my hands on the side of her head. And I disarmed her of a hammer."

4

Petitioner claimed that he was "very worried about the baby"; however, he admitted to messaging D.J. while she was at the hospital to say that he hoped the baby died.

After the close of evidence, the court instructed the jury, the parties made their closing arguments, and the jury deliberated. Ultimately, the jury found petitioner guilty of each count charged in the indictment.

Post-trial, petitioner filed motions for a new trial and for judgment of acquittal. In support of his motion for a new trial, petitioner argued that S.Z.'s social media posts regarding petitioner's alleged abuse of her were hearsay for which no exception applied, could only have been introduced to impeach her credibility, and were not substantive evidence. Further, S.Z. testified that petitioner did not commit domestic violence against her; therefore, her testimony was not relevant or admissible under Rule 404(b). Petitioner also argued that the Rule 404(b) evidence's "prejudice heavily outweighed any probative value it may have had." In his motion for judgment of acquittal, petitioner argued that the evidence was insufficient to prove that he committed domestic battery against D.J.'s fetus because there was no evidence of contact, either direct or indirect, with the fetus.[5]

On October 17, 2019, the parties appeared before the court for a hearing on petitioner's post-trial motions and sentencing. In support of his earlier-filed motions for judgment of acquittal and for a new trial, petitioner argued that he was entitled to a judgment of acquittal on the domestic battery counts against the fetus because "for domestic battery there has to be contact of an offensive or provoking nature or injury," and "[y]ou do not have that in this case with the unborn child." Petitioner argued that the court erred in admitting the Rule 404(b) evidence, which entitled him to a new trial.

Regarding the domestic battery against the fetus, the court reiterated the ruling it made at trial:

> It's almost as if it's a BOGO, Buy One Get One Free. So if you do, in fact, cause domestic battery or are found to have committed domestic battery on a person, a person being a female, a pregnant female, then ergo, you have almost per se committed a domestic battery on a fetus. That simply appears to be what the law is.

Concerning the Rule 404(b) evidence, the court stated that it also "stands by its decision to allow the evidence in." Petitioner's motions were, accordingly, denied.

The court proceeded to sentence petitioner to not less than one nor more than five years of incarceration for his strangulation conviction, twelve months for each domestic battery conviction, and twelve months for unlawful restraint. The court ordered that petitioner's sentences for strangulation, unlawful restraint, and the two counts of domestic battery against D.J. run

---

[5] Petitioner also argued that the evidence was insufficient to support his unlawful restraint and strangulation convictions. The specifics of those arguments are not recounted here because petitioner does not challenge the sufficiency of the evidence in support of those convictions on appeal.

consecutively, and the two counts of domestic battery against the fetus were ordered to run concurrently with the sentences imposed for domestic battery against D.J. The court entered its order memorializing petitioner's sentence and the court's rulings on petitioner's post-trial motions on October 23, 2019, and it is from this order that petitioner appeals.

Petitioner raises two assignments of error on appeal. In his first, he challenges the sufficiency of the evidence to support his domestic battery convictions as they related to D.J.'s fetus. In particular, petitioner claims that the State failed to present any evidence that he contacted D.J.'s fetus or that the contact was insulting or provoking and, instead, relied on the evidence in support of the domestic battery convictions pertaining to D.J. to support automatic convictions pertaining to D.J.'s fetus. In this vein, petitioner further argues that the circuit court's ruling—that proof of a domestic battery against a pregnant woman is proof of a domestic battery against that woman's fetus—ignored that a pregnant woman and fetus are distinct victims under the Act and, therefore, deprived him of due process. *See* syl. pt. 7, in part, *State v. Jenkins*, 191 W. Va. 87, 443 S.E.2d 244 (1994) ("In a criminal prosecution, the State is required to prove beyond a reasonable doubt every material element of the crime with which the defendant is charged . . . .").

In reviewing the sufficiency of the evidence to support his convictions relative to the fetus, this Court

> examine[s] the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. Pt. 1, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). A defendant's task in this regard is not easy:

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

*Id.* at 663, 461 S.E.2d at 169, syl. pt. 3, in part.

The Act provides, in relevant part, that

6

*[f]or purposes of enforcing the provisions of* sections one, four and seven of this article,[6] subsections (a) and (c), section nine of said article,[7] sections ten and ten-b of said article[8] and subsection (a), *section twenty-eight of said article, a pregnant woman and the embryo or fetus she is carrying in the womb constitute separate and distinct victims.*

W. Va. Code § 61-2-30(c) (emphasis added).

West Virginia Code § 61-2-28 criminalizes domestic violence and, with specific respect to domestic battery, provides that "[a]ny person who unlawfully and intentionally makes physical contact of an insulting or provoking nature with his or her family or household member, or unlawfully and intentionally causes physical harm to his or her family or household member, is guilty of [the] misdemeanor" offense of domestic battery. W. Va. Code § 61-2-28(a). Because D.J.'s fetus was physically unharmed, the State argued at trial that petitioner committed domestic battery against the fetus by making physical contact of an insulting or provoking nature.

Petitioner's assertion that the State failed to present evidence of physical contact in an insulting or provoking manner to D.J.'s fetus is clearly incorrect. D.J. testified that petitioner repeatedly threw her to the floor, and, as Dr. O'Neal testified, she relayed to him that she was concerned that, in throwing her to the floor, petitioner struck her abdomen. Indeed, because of her concern for how petitioner's actions affected her fetus, D.J. begged him to return her phone so that she could call for help. Acknowledging the risk to the fetus that he created, petitioner called D.J. to express his hope for the child's death. Viewing this evidence in the light most favorable to the prosecution and crediting all inferences that the jury may have drawn in favor of the prosecution, we cannot say that there is no evidence of physical contact of an insulting or provoking nature from which the jury could have found guilt beyond a reasonable doubt.[9] Accordingly, we need not address the particulars of the circuit court's reading of the Act.

---

[6] West Virginia Code § 61-2-1 addresses first- and second-degree murder, West Virginia Code § 61-2-4 addresses voluntary manslaughter, and West Virginia Code § 61-2-7 addresses attempts to kill or injure by poison.

[7] West Virginia Code § 61-2-9(a) addresses malicious or unlawful assault, and subsection (c) addresses battery.

[8] West Virginia Code § 61-2-10 addresses assault during the commission of or attempt to commit a felony, and West Virginia Code § 61-2-10b addresses malicious assault, unlawful assault, battery, and assault on governmental representatives, health care providers, utility workers, law-enforcement officers, correctional employees and emergency medical service personnel.

[9] Petitioner contends that insult and provocation were impossible to prove because those "elements require cognition which, by definition, a fetus/person does not obtain until after birth." Petitioner cites no law to support the assertion that the conduct must be viewed from the victim's perspective. To the contrary, in *State v. Rice*, No. 11-0419, 2011 WL 8197532 (W. Va. Sept. 13,

(continued . . .)

In petitioner's second assignment of error, he argues that the court erred in admitting evidence of the S.Z. incident under Rule 404(b). He challenges each of the purported permissible uses identified by the State and circuit court in admitting the 404(b) evidence, he argues that he was prejudiced by the improper admission of the evidence, and he also claims error in the court's failure to conduct an on-the-record balancing of the probative value of the evidence against its prejudicial impact, except as it related to Officer Duncan's body camera footage.

We begin by noting that petitioner failed to raise below any issue concerning the court's purported failure to conduct an adequate on-the-record balancing. "To preserve an issue for appellate review, a party must articulate it with such sufficient distinctiveness to alert a circuit court to the nature of the claimed defect." *State v. Sites*, 241 W. Va. 430, 438, 825 S.E.2d 758, 766 (2019) (citation omitted). And, "'[o]ne of the most familiar procedural rubrics in the administration of justice is the rule that the failure of a litigant to assert a right in the trial court likely will result' in the imposition of a procedural bar to an appeal of that issue." *State v. Miller*, 194 W. Va. 3, 17, 459 S.E.2d 114, 128 (1995). Because petitioner failed to raise this issue at the appropriate time below, we decline to consider it on appeal. *See State v. J.S.*, 233 W. Va. 198, 207, 757 S.E.2d 622, 631 (2014) ("The failure to timely raise the issue below has resulted in waiver of the matter in this appeal.").

Concerning the other grounds raised by petitioner in challenging the admission of the Rule 404(b) evidence, we note that the State concedes error but argues that the introduction of this evidence was harmless. Under these circumstances, our review is as follows:

> Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.

Syl. Pt. 2, *State v. Atkins*, 163 W. Va. 502, 261 S.E.2d 55 (1979).

Removing the Rule 404(b) evidence from the State's case leaves ample evidence to support petitioner's convictions. Petitioner's convictions could be sustained by D.J.'s testimony alone; however, the State offered much more. D.J.'s mother, who picked D.J. up from petitioner's company, testified that she saw the injuries inflicted by petitioner on her daughter. Dr. O'Neal, likewise, observed that it looked like D.J. had been in an altercation. The medical records and photographs documenting D.J.'s injuries were consistent with her testimony of the injuries

2011)(memorandum decision), we recognized that "[w]e have not held that the determination of what constitutes insulting or provoking contact must be made subjectively from the victim's perspective." *Id.* at *2. We decline to hold here that the victim's perspective constitutes the relevant perspective from which a determination of insult or provocation is made.

8

petitioner inflicted, and petitioner admitted to Trooper Beck that things got physical. We further find that the error had no prejudicial effect on the jury. Rather, the jury simply did not buy petitioner's incredible story, which included both claims that were flatly contradicted by the evidence and his assertion that he just happens to date women who are prone to self-harm. Accordingly, we find no error.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** December 16, 2020

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Elizabeth D. Walker
Justice Evan H. Jenkins


Chief Justice Tim Armstead, concurring:

I fully concur with the Court's decision affirming the petitioner's conviction and the circuit court's sentence imposed in this case. I agree with the Court's determination in the memorandum decision that "we cannot say that there is no evidence of physical contact of an insulting or provoking nature from which the jury could have found guilt beyond a reasonable doubt." I write separately in order to stress that the Court's decision is limited to the facts of the instant case and should not be read as requiring, under the Unborn Victims of Violence Act, West Virginia Code § 61-2-30, (the "Act"), that there be physical contact of the fetus in order to uphold a conviction of battery under the terms of the Act.

The State in this matter argued that the battery against the pregnant mother of the fetus was sufficient to convict the petitioner for battery against the fetus under the Act. From the record before us, the circuit court appeared to agree with the State's position in this regard. As stated above, this Court concluded in its memorandum decision in this case, that the record does not support the Petitioner's argument that there was "no evidence of physical contact of an insulting or provoking nature from which the jury could have found guilt beyond a reasonable doubt." The majority further concluded that "[a]ccordingly, we need not address the particulars of the circuit court's reading of the Act."

I agree that the evidence in this case did, in fact, support a finding that the Petitioner's actions constituted "physical contact of an insulting or provoking nature" against the fetus. However, such decision should not be read to require that there be physical contact with the fetus in every case for there to be a battery conviction against the fetus as a separate victim under the Act. Because there was such contact in this particular case, the Court has left for another day the determination of whether a battery against the pregnant mother of an unborn fetus, without specific contact with the fetus, constitutes a separate battery against the fetus under the Act. This

9

memorandum decision should not be read to hold, nor does it imply, that domestic battery of a fetus under the Act may be upheld only when there is physical contact with the fetus.

**DISSENTING:**

Justice Margaret L. Workman
Justice John A. Hutchison

Hutchison, J., dissenting:

I dissent to the majority's resolution of this case. I would have set this case for oral argument to thoroughly address the error alleged in this appeal. Having reviewed the parties' briefs and the issues raised therein, I believe a formal opinion of this Court was warranted—not a memorandum decision. Accordingly, I respectfully dissent.