No. 21-0738, *State of West Virginia v. Tremaine Jackson*

**FILED**

**June 9, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Armstead, Justice, dissenting:

I dissent in this matter because I do not believe the circuit court erred by refusing Mr. Jackson's offer to stipulate to his prior manslaughter conviction. However, even if the circuit court did err in this respect, I believe any such error was harmless.

When a defendant offers to stipulate to a prior conviction, the defendant is likely hoping to avoid the "unfair prejudice" that occurs when a "some concededly relevant evidence . . . lure[s] the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (quoting Fed. R. Evid. 403[1]). Rule 403 of the West Virginia Rules of Evidence authorizes a circuit court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" However, Rule 403 does not require such evidence to be excluded; it states that a "court *may* exclude" such evidence. *Id.* (emphasis added). This means that, like other evidentiary rulings, a decision about whether to exclude evidence of a defendant's prior conviction is a matter of discretion. Syl. Pt. 2, in part, *State v. Peyatt*, 173 W. Va. 317, 315 S.E.2d 574 (1983) (holding that "[r]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion").

---

[1] Federal Rule of Evidence 403 authorizes a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]"

1

On the facts of this case, I do not believe that the circuit court abused its discretion when it refused to accept Mr. Jackson's untimely stipulation. From the beginning of this case, Mr. Jackson was on notice that the State would seek to introduce evidence of his prior conviction. The grand jury indicted him for, among other things, being a felon in possession of a firearm, and the September 2020 indictment clearly states that his prior conviction was for voluntary manslaughter. Thus, proving the prior conviction was an essential element of the State's case. Mr. Jackson was also plainly aware of the potential prejudice that could result from such evidence. Indeed, in February 2021, Mr. Jackson's counsel asked the circuit court to "deny the State's admission of the [Rule] 404(b)[2] evidence due to . . . the prejudicial effect" such evidence would have on his right to "get a fair trial[.]" Nevertheless, Mr. Jackson did not offer to stipulate to his prior conviction until the State attempted to prove it during the March 2021 trial. In response, the prosecutor pointed out, "I attempted to elicit a stipulation before today and was unsuccessful. Now the State's being put in a spot where, because I've developed this testimony and have this witness here and now that I've boxed them into a corner, they want to stipulate." After hearing argument from counsel, the circuit judge stated,

> The best I can offer is the limiting instruction, to tell the jury it's for this and not for that. There'll be no reference to the underlying facts or anything other than what's in this [sentencing] order, which is nothing more than the fact there was a conviction with a firearm finding.

---

[2] West Virginia Rule of Evidence 404(b) provides that "[e]vidence of a crime, wrong, or other act . . . may be admissible for . . . proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

2

I wish it were cleaner than that. A stipulation would have made it much cleaner and we could manage, but you are where you are and you've chosen to do what you've chosen to do for reasons that you each find satisfactory.

So the objection will be overruled, but the Court will give a limiting instruction right away.

The limiting instruction . . . is that this is admitted only . . . with respect to Count 3 [(felon in possession of a firearm)] and Cou[n]t 4 [(using or presenting a firearm while a felon in possession of a firearm)] but may not be considered with respect to Count 1 [(murder)] or Count 2 [(using a firearm to commit murder)].

Under the circumstances, I don't believe the circuit court's ruling reflected an abuse of discretion. Mr. Jackson did not deny that the State attempted to obtain a stipulation from him before trial, and he should have known from the beginning that his prior conviction was something the State would seek to prove—*indeed, had to prove*—at trial. Accordingly, I dissent from the majority's finding that the circuit court erred by refusing Mr. Jackson's mid-trial offer to stipulate to his prior manslaughter conviction.

Even if the circuit court erred by refusing his untimely stipulation, the court's error was evidentiary, not constitutional. *See Old Chief*, 519 U.S. at 191 (applying Fed. R. Evid. 403); W. Va. R. Evid. 403. When "improper evidence of a nonconstitutional nature" is admitted, we exclude the inadmissible evidence and pose two questions. First, we ask "whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt[.]" Syl. Pt. 2, in part, *State v. Atkins*, 163 W. Va. 502, 261 S.E.2d 55 (1979), *cert. denied*, 445 U.S. 904 (1980). Second, we ask "whether the error had any prejudicial effect on the jury." *Id.* I dissent in this matter

3

because I believe that, even if the circuit court erred in allowing admission of the prior conviction evidence, the other evidence before the jury was sufficient to sustain Mr. Jackson's convictions and because I believe that the circuit court's error had no prejudicial effect on the jury.

In *Adkins*, we offered the following description of how we analyze the significance of an evidentiary error involving an improper admission of evidence:

> In any inquiry into the prejudicial impact of the error, we will be guided by whether the record reveals that the error was *repeated or singled out for special emphasis* in the State's argument. We will scrutinize the record to determine if the error became the subject of a *special instruction* to the jury[] or *produced question* from the jury. Also of importance is *the overall quality of the State's proof. . . .* If the case contains a number of *substantial key factual conflicts* or is basically a *circumstantial evidence* case[] or is one that is largely *dependent on the testimony of a co-participant* for conviction, there is an increased probability that the error will be deemed prejudicial.
>
> Further, if the error is *related to critical testimony of the defendant*, the more likely that it will be deemed prejudicial. . . . A further consideration is *the cumulative effect* of the error in the context of the entire trial.

*Id.* at 514–15, 261 S.E.2d at 62–63 (emphasis added).

Applying these considerations to Mr. Jackson's trial, I note, first, that he does not contend that the prosecutor's argument emphasized or otherwise misused the evidence of his prior conviction. In addition, after admitting evidence of the prior conviction, the circuit court issued an immediate and clear instruction advising the jury that evidence of this conviction was not to be considered with respect to Count 1 (murder) or Count 2 (using

4

a firearm to commit murder) but "only" with respect to Count 3 (felon in possession of a firearm) and Count 4 (using or presenting a firearm while a felon in possession of a firearm). Although, as Mr. Jackson observes, the jurors posed two questions during deliberation, neither question pertained to the circuit court's error in admitting evidence of Mr. Jackson's prior conviction.

More importantly, the State's evidence was overwhelming and contained abundant eyewitness testimony. As the State's evidence showed, this case stems from a scheme to sell counterfeit methamphetamine (i.e., rock salt) to the murder victim. Mr. Jackson traveled to the sale with three women, Araena Kersey, Tohasha Ugbomah, and Latoya Carter, all of whom testified for the State. When the group arrived at the parking lot where the sale was to occur, Mr. Jackson got out, and the women remained in the car. Then the victim entered the backseat to test the supposed drugs. At some point, Ms. Kersey put a gun to the victim's head and demanded his money. The victim fled the car and was later shot in the chest. The State contended that Mr. Jackson was the shooter.

One witness was a man who happened to be nearby during the murder and observed two men talking by a white car. According to the witness, he saw a "flash" and heard a "noise." Though he did not recognize the sound at first, he saw the victim fall and saw the "other guy that shot" come around the back of the car "kind of like holding the gun towards him [i.e., the victim.]" The witness could not identify the shooter, except to describe certain identifying characteristics. However, a detective later testified that the witness's description of the shooter matched Mr. Jackson's appearance on the date of the murder.

5

Ms. Carter testified and described the scheme to sell counterfeit methamphetamine to the victim. She identified an M&P 9 handgun with an extended magazine and testified that it belonged to Mr. Jackson. Expert testimony later established that this M&P 9 handgun was the murder weapon. According to Ms. Carter, the M&P 9 handgun was one of two handguns in the vehicle that day, the other being a Hi Point firearm possessed by Ms. Kersey, and Mr. Jackson was the only member of their party who was outside the car when the victim was shot. She also related a conversation between Mr. Jackson and Ms. Kersey about where the victim had been shot.

Ms. Ugbomah reported hearing Ms. Kersey "cock" a gun and demand money from the victim. However, she testified that the gun that killed the victim went off outside the vehicle and that Mr. Jackson, who was outside the vehicle, shot the victim. Ms. Ugbomah further testified that, after the shooting, Mr. Jackson gave a gun and a "long" magazine to Ms. Carter and that Mr. Jackson admitted to shooting the victim.

Ms. Kersey admitted to pulling a Hi-Point 9 handgun on the victim. However, she testified that, after the victim fled the car, Mr. Jackson pushed him down and demanded his money. She further testified that Mr. Jackson admitted to shooting the victim. According to her, all four travelers were in on the fraudulent scheme, and there were two guns in the car—her own Hi-Point 9 handgun and Mr. Jackson's M&P 9 handgun. In the face of this evidence, Mr. Jackson offered only his own self-serving testimony and did not deny that he was present during the shooting, though he did deny possessing a gun.

While it is true that several of the State's witnesses were participants in the scheme to sell counterfeit methamphetamine, there were three such witnesses, and their

6

testimony substantially agreed. In addition, their testimony was substantially confirmed by an unrelated person who witnessed a man of Mr. Jackson's appearance pointing a weapon at the wounded victim. Finally, in my view, the admission of the prior conviction evidence had no appreciable impact, whether cumulative or otherwise, in the context of his trial.

Thus, in my view, the State's evidence was sufficient to support a finding of guilt beyond a reasonable doubt and, indeed, established Mr. Jackson's guilt with such clarity that I believe evidence of his prior manslaughter conviction had no effect on the jury's decision to convict. Accordingly, I respectfully dissent.[3]

---

[3] Mr. Jackson also assigns error to the circuit court's refusal to allow him to offer his own testimony about who shot the victim. Because the majority does not reach the merits of this additional assignment of error, I likewise do not address this issue.