IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2025 Term

_____

No. 22-822
_____

**FILED**

**June 2, 2025**

**released at 3:00 p.m.**
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent,

v.

DAVID HUNTER LEWIS,
Defendant Below, Petitioner.

_____

Appeal from the Circuit Court of Marion County
The Honorable David R. Janes, Judge
Case No. 21-F-132

AFFIRMED IN PART; REVERSED IN PART; AND
REMANDED WITH DIRECTIONS
_____

Submitted: February 19, 2025
Filed: June 2, 2025

Jeremy B. Cooper, Esq.
Blackwater Law PLLC
Aspinwall, Pennsylvania
Counsel for Petitioner

John B. McCuskey, Esq.,
Attorney General
Michael R. Williams, Esq.,
Solicitor General
Charleston, West Virginia
Counsel for Respondent

CHIEF JUSTICE WOOTON delivered the Opinion of the Court.

JUSTICE ARMSTEAD concurs and reserves the right to file a separate opinion.

JUSTICE BUNN concurs and reserves the right to file a separate opinion.

**SYLLABUS BY THE COURT**

1.     "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995)."

2.     "In determining whether the assigned plain error affected the 'substantial rights' of a defendant, the defendant need not establish that in a trial without the error a reasonable jury would have acquitted; rather, the defendant need only demonstrate the jury verdict in his or her case was actually affected by the assigned but unobjected to error." Syl. Pt. 3, *State v. Marple,* 197 W. Va. 47, 475 S.E.2d 47 (1996).

3.     "'Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any

prejudicial effect on the jury.'  Syl. Pt. 2, *State v. Atkins*, 163 W. Va. 502, 261 S.E.2d 55 (1979)."). Syl. Pt. 3, *State v. Kessler*, 248 W. Va. 289, 888 S.E.2d 789 (2023).

4.     """The plain error doctrine contained in Rule 30 and Rule 52(b) of the West Virginia Rules of Criminal Procedure is identical. It enables this Court to take notice of error, including instructional error occurring during the proceedings, even though such error was not brought to the attention of the trial court. However, the doctrine is to be used sparingly and only in those circumstances where substantial rights are affected, or the truth-finding process is substantially impaired, or a miscarriage of justice would otherwise result." Syllabus Point 4, *State v. England,* 180 W. Va. 342, 376 S.E.2d 548 (1988).' Syl. Pt. 6, *State v. Collins,* 186 W. Va. 1, 409 S.E.2d 181 (1990)." Syl. Pt. 5, *State v. Wilson*, 190 W. Va. 583, 439 S.E.2d 448 (1993).

WOOTON, Chief Justice:

Petitioner David Hunter Lewis ("the petitioner") appeals from the October 11, 2022, order entered by the Circuit Court of Marion County, West Virginia, sentencing him to concurrent forty- and ten-year terms of imprisonment, respectively, on his convictions on one count of second-degree murder (with a firearm)[1] and one count of use of a firearm during the commission of a felony.[2] His primary argument on appeal is that from the very beginning of his trial and continuing unchecked until the very end, Respondent State of West Virginia ("the State") introduced a veritable flood of evidence concerning the character of the victim – evidence wholly "irrelevant to any issue in the case and . . . presented for the sole purpose of gaining sympathy from the jury." Syl. Pt. 10, in part, *State v. Wade*, 200 W. Va. 637, 490 S.E.2d 724 (1997).

This Court has carefully reviewed the appendix record, the briefs and arguments of the parties, and the relevant law, and we conclude that the State's clearly announced strategy at trial to "make this case . . . more about [the victim]" than the guilt or innocence of the petitioner constitutes plain error under the facts and circumstances

---

[1] *See* W. Va. Code § 61-2-1 (2020); *see also* Syl. Pt. 2, in part, *State v. Drakes*, 243 W. Va. 339, 844 S.E.2d 110 (2020) ("Murder in the second degree is the unlawful, intentional killing of another person with malice, but without deliberation and premeditation.").

[2] *See* W. Va. Code § 61-7-15a (2020).

1

evidenced in the record. Accordingly, we reverse the petitioner's conviction and remand this case for a new trial.

## FACTS AND PROCEDURE BELOW

The relevant facts of this case, when viewed in a light most favorable to the verdict winner,[3] are largely uncontested, although differing inferences which may be drawn from some of the facts were vigorously argued to the jury. On December 15, 2020, the petitioner and Dylan Harr ("the victim") were both guests at an apartment in Fairmont, West Virginia, where a number of young people "hung out" with the tenants and socialized on a regular basis; indeed, one of the tenants described the apartment as being "like a frat house." At some point during the evening the petitioner had an argument with the tenants and several of their guests[4] over allegations that he was stealing money, after which he was asked to leave the apartment and did so almost immediately after gathering a few of his belongings. A few minutes later the victim and two teenage companions left as well. With

---

[3] *See, e.g.*, Syl. Pt. 1, in part, *State v. Fiske*, 216 W. Va. 365, 607 S.E.2d 471 (2004) ("In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution.") In the instant case, the petitioner does not challenge the sufficiency of the evidence to support his convictions.

[4] The evidence was conflicting as to whether the victim was present during this argument; one witness placed him in the upstairs room where the argument was ongoing, while another placed him on the stairs somewhere between floors. There was no evidence that the victim participated in the argument or was involved in any way.

2

the teens lagging behind, the victim caught up to the petitioner and put his arm around his shoulder, whereupon the petitioner turned and shot the victim with a gun he had in his pocket. In this latter regard, the two teen eyewitnesses agreed that the petitioner never took the gun out of his pocket, and indeed, the petitioner's jacket, when retrieved, had a bullet hole in the pocket.[5] The petitioner then took off running, discarding his jacket, backpack, and a pair of boots (and apparently the gun, which was never found) under the porch of another residence some distance away. In the meantime, the victim staggered back into the apartment where one of the tenants called 9-1-1 and the other drove him to the hospital. The victim did not survive his injury.

The police, who had been informed of the shooting by virtue of the 9-1-1 call, located and seized the backpack, jacket, and boots,[6] and after a few hours of searching apprehended the petitioner at a Sheetz convenience store ("Sheetz"), where he was on the phone with a girlfriend trying to arrange transportation out of town. The petitioner was

---

[5] The angle of the shot, described by a pathologist as front to back and downward from the base of the neck to below the scapula, was somewhat inconsistent with the eyewitnesses' description of events. The petitioner and the victim were roughly the same height. One eyewitness testified that the petitioner was bent over and raised his arm (without ever taking his hand out of his jacket pocket) in order to take a downward shot, while the other eyewitness testified that the *victim* was bent over and that the gun (still in the petitioner's pocket) was "pointed up." The fact that there was a bullet hole in the pocket but not in the jacket makes either scenario difficult to envision.

[6] The police had information that the petitioner was associated in some fashion with the property at which the items were found.

immediately given *Miranda*[7] warnings and invoked his right to remain silent after telling the officers that "there's no gun" or "what gun" or something of the sort. After the petitioner was transported to the police station, however, he was given *Miranda* warnings a second time and signed a waiver of rights. The petitioner asserted his innocence, chatted casually with the officers, answered a number of seemingly innocuous questions, and cooperated with a powder residue test, but invoked his right to counsel when the officers' questions became more pointed. Questioning immediately ceased once the petitioner had invoked his right to counsel.

The petitioner was indicted on one count of first-degree murder and one count of use of a firearm in the commission of a felony. *See supra* notes 1 & 2. Of relevance to the issues raised on appeal, during pre-trial proceedings the petitioner moved to suppress any statements made to the police either during his apprehension at Sheetz or during his interview at police headquarters. The circuit court held that any statements made at Sheetz after the petitioner had been given *Miranda* warnings were inadmissible, but that any pre-*Miranda* statements, as well as any statements made at the police station after the petitioner signed his waiver of rights, were admissible.

The State called sixteen witnesses at trial. Although there was no evidence as to what, if anything, was said during the few seconds which elapsed between the victim's

---

[7] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

4

action in catching up with the petitioner and putting his arm around the petitioner's shoulder, and the petitioner's action in turning to face the victim and shooting him, the State presented eyewitness testimony that, following a week of tension between the two, the petitioner and the victim had engaged in a physical altercation two days before their fatal encounter. The fight was arranged in advance and took place in the presence of friends, two of whom made video recordings on their phone cameras. The fight was described by one witness as "[a] few punches on each side and a lot of grappling on the ground[.]" When the fight – which lasted for two rounds – had ended, the petitioner helped the victim to his feet, after which the two antagonists smoked a cigarette together, looked at cell phone footage of their fight, and, at least in the eyes of the individuals present at the time, resolved their differences.

In his opening statement, the prosecutor announced to the jury that "[t]his case isn't really about [the petitioner]. It's about what he did. *And more important, it should be, and I hope by the end you agree, that it should be about Dylan Harr*." (Emphasis added). The prosecutor then went on:

> You'll hear from a number of witnesses who to a person will say that Dylan was a terrific young man. Dylan was 20 years old, but mature already beyond his years. He was a big brother to [G.S.] to E.M. Rapidly becoming fast friends. He was like a brother to Russell Scritchfield, who was one of the two leaseholders at the apartment on Bryant Street that we'll talk a lot about. Had become a very good friend of Russe's roommate, McKenzie McCullough, and her younger brother, who was also living at the apartment. They had a close-nit relationship in this house.

5

Dylan was a hardworking young man, making and delivering pizzas for Papa John. At 20 years old, doing so enough that he's supporting his young son, Maverick, who was just barely a year of age back in December of 2020. And I'll tell you something about the character the evidence will show of Dylan. Dylan had successfully fought and won joint custody of his young son, Maverick, which is unheard of for a 20-year-old male. Hard, hard to get joint, complete 50/50 custody as a father. Because you're out busy hustling and making a living and hopefully contributing to the lives of your children. But that's exactly what he did. And the folks that lived at Bryant Street had seen him, saw a whole lot more of Dylan on the weeks when he didn't have his son. But several of them worked together. He had actually help[ed] McKenzie, he and Russell, get her a job at Papa John's. So these young 20-year-old kids scraping by an existence and living on their own at 20 making and delivering pizzas is to be commended. I remember those days of working hard and scratching out an existence and trying to go to school right beside where this apartment was.

It all came to a screeching halt on December 15, 2020. Maverick's not going to know his dad. He'll never remember his daddy. He was just barely a year old when [the petitioner] just snatched the life out of Dylan Harr by using a firearm to shoot him right in the chest.

Having announced that the character of the victim was "what this case is[] really about," the State proceeded to elicit testimony that the victim was "like a brother," "thoughtful," "goofy," "funny," "a jokester," "loving," "a genuine soul," "a cool dude," "chill," someone who "always took care of his kid," and someone who "wouldn't hurt a fly." The jury was told that the victim was a "good friend" to many, a "terrific young man," loved by his many friends "like a brother," someone who had "an instant and immediate impact on those that he met," a "significant contributor to our community," "mature already beyond his years," "hardworking," and an "incredible father."

6

During closing argument, the prosecutor summed up the State's case:

> I told you at the outset also that this case, I didn't want to make it about [the petitioner]. He's certainly the one here who's facing these charges and who's [sic] guilt you have to decide and render a verdict on. But this case is more about Dylan, and . . . I want to remember him much more than I want to give undue attention to [the petitioner], who committed this wicked and evil act.

As the State is quick to point out, the petitioner's counsel did not object to either the State's opening statement or its closing argument. Further, counsel lodged only two objections to the dozens of instances in which witnesses were asked about, and testified to, the victim's character: counsel objected to G.S.'s testimony that the victim always took care of his son and included his friends when playing with his son, and Russell Scritchfield's testimony that the victim was "a brother from another mother" and that he (Mr. Scritchfield) was little Maverick's godfather. The circuit court overruled both objections.

Following the petitioner's conviction, he filed post-trial motions raising two issues: that the State's witnesses were not credible and that the State was permitted to present irrelevant and prejudicial evidence concerning the victim's character; and that the

State's evidence was insufficient as a matter of law to support the verdict.[8] The circuit court denied the motions, holding, inter alia, that the character evidence was admissible pursuant to Rule 404(a)(2)(C) of the West Virginia Rules of Evidence, which provides that "in a homicide case, the prosecutor may offer evidence of the alleged victim's trait of peacefulness to rebut evidence that the victim was the first aggressor." This appeal followed.

## STANDARD OF REVIEW

The petitioner raises four issues on appeal, only two of which merit discussion. *See infra*. The first issue for resolution, which is dispositive, is whether the introduction at trial of evidence and argument concerning the victim's character – which the State itself characterized as "what this case is[] really about" – was error; and if so, whether the error warrants reversal of the petitioner's conviction despite his counsel's failure to object to the evidence and argument. In this regard, it is well established in our case law that "[t]o trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. pt. 7, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). The second issue is whether the circuit court erred in permitting the State to introduce into evidence the petitioner's statements to law

---

[8] On appeal, the petitioner does not argue either that the testimony of the State's witnesses was unworthy of belief or that the State's evidence was insufficient to support the verdict.

enforcement at the police station after he had invoked his right to silence during his arrest at Sheetz. Here,

> [w]e apply an abuse of discretion standard of review to a circuit court's decision on the admissibility of a confession. "It is a well-established rule of appellate review in this state that a trial court has wide discretion in regard to the admissibility of confessions and ordinarily this discretion will not be disturbed on review." Syl. pt. 2, *State v. Vance*, 162 W. Va. 467, 250 S.E.2d 146 (1978).

*State v. Campbell*, 246 W. Va. 230, 237, 868 S.E.2d 444, 451 (2022). We have cautioned, however, that

> [t]his Court is constitutionally obligated to give plenary, independent, and *de novo* review to the ultimate question of whether a particular confession is voluntary and whether the lower court applied the correct legal standard in making its determination. The holdings of prior West Virginia cases suggesting deference in this area continue, but that deference is limited to factual findings as opposed to legal conclusions.

*Id*. (citing Syl. pt. 2, *State v. Farley*, 192 W. Va. 247, 452 S.E.2d 50 (1994)). With these standards to guide our analysis, we turn to the issues in this case.

## DISCUSSION

### Evidence of the Victim's Good Character

We preface our discussion by noting that this Court will not address the petitioner's initial argument that the circuit court erred by "repeatedly overruling the objections of the petitioner to irrelevant testimony concerning the decedent's character" because, as noted, a review of the record reveals that there were only two such objections lodged during the entire course of the trial. Thus, even if those two objections were well

9

grounded, *see* discussion *infra*, it is clear that any error in admitting evidence in these two limited circumstances would be harmless.[9] Rather, the question properly before us is whether the admission into evidence of all the testimony relating to the victim's character, together with all of the references thereto in the State's opening statement and closing argument, constitutes plain error under the four-prong test established in *Miller*. *See* 194 W. Va. at 7, 459 S.E.2d at 116, Syl. Pt. 7.

**Admission of the evidence was error**. The West Virginia Rules of Evidence severely limit the State's ability to present evidence of a crime victim's character; specifically, "the prosecutor may offer evidence of the alleged victim's trait of peacefulness to rebut evidence that the victim was the first aggressor." W. Va. R. Evid. 404(a)(2)(C). This Court has held that the rule

> is essentially a codification of the common law concerning the admission of character evidence . . . and it has long been the case in West Virginia that "[u]ntil attacked by the defense, the deceased's character for peaceable and quiet conduct is presumed to have been good, and the state may not make it a subject of primary proof.

*State v. Neuman*, 179 W. Va. 580, 582, 371 S.E.2d 77, 79 (1988) (citations omitted). Further, "the prosecution cannot, in the first instance and as a part of its evidence in chief, or before the character of the deceased has been attacked by the defense, introduce evidence

---

[9] *See, e.g.*, *State v. McIntosh*, 207 W. Va. 561, 578, 534 S.E.2d 757, 774 (2000) (finding evidentiary error to be harmless where it "could scarcely [be said to] prejudice the substantial rights of the Appellant, and we discern no reasonable possibility that the exclusion affected the outcome of the trial.").

10

of the reputation of the deceased for peaceableness or prove that he was a quiet and orderly citizen." *Id.* The reason for the rule is obvious: evidence of the victim's good character is irrelevant to the defendant's guilt or innocence and is almost always highly prejudicial in that it invokes sympathy for the victim and anger toward the defendant.

In this case, the State attempts to justify the admission of the character evidence by claiming that the petitioner's defense was self-defense, i.e., that the victim was the aggressor in what transpired between the two. The record does not bear out this assertion. The petitioner did not mention self-defense in his opening statement; did not mention it in his closing argument; and did not request that the jury be given a self-defense instruction. His defense was, at all times, that the State's evidence was insufficient to prove the shooting was anything other than an accident because there was no testimony as to what (if anything) was said after the victim put his arm around the petitioner's shoulders.[10] Further, although defense counsel asked both of the eyewitnesses on cross-examination whether the victim's gesture had been "forceful" or "sudden" – to which both responded in the negative, which was the end of the matter – it is a giant step too far to find that the

---

[10] Defense counsel summed up the petitioner's defense as follows:

> Why did Dylan follow David after he left the house? What happened between them, if anything, immediately before this shot happens? Why did Dylan have anything to do with David after he had just been kicked out? No witness has provided any of these answers. It is pure speculation on [the prosecutor's] part, and it is equal speculation on the defense part.

petitioner thereby raised a self-defense claim. Finally, it is another giant step too far to claim that evidence and argument that the victim had "an instant and immediate impact on those that he met," was a "significant contributor to our community," was "mature already beyond his years," was "hardworking," and was an "incredible father" who left behind a young son who would never remember his loving father, falls within Rule 404(a)(2)(C) as evidence and argument concerning the victim's reputation for peacefulness. And in any event, it will be recalled that the State discussed the victim's character at great length in its opening statement, in violation of the rule clearly set forth in *Neuman* that "[i]t is improper for the prosecution to offer evidence of the victim's peacefulness until *after* the defense has offered evidence which either attacks a pertinent character trait of the victim or tends to show that the victim was the first aggressor." *Id*. at 583, 371 S.E.2d at 80.

We reject the State's after-the-fact attempts to justify its avowed strategy in this case, which was clearly and unequivocally announced to the jury in opening statement: "[t]his case isn't really about [the petitioner]. It's about what he did. And more important, it should be, and I hope by the end you agree, that it should be about Dylan Harr." We find that the State's constant references to the victim's character, and its introduction of evidence as to that character, constituted error.

**The error was plain**. As this Court noted in *State v. Myers*, 204 W. Va. 449, 513 S.E.2d 676 (1998), "[o]ur cases have held that "[t]o be 'plain,' the error must be 'clear'

12

or 'obvious.'" *Id*. at 461, 513 S.E.2d at 688 (citing Syl. pt. 3, in part, *State ex rel. Morgan v. Trent,* 195 W. Va. 257, 465 S.E.2d 257 (1995)). We went on to explain that

> "[u]nder a plain error analysis, an error may be 'plain' in two contexts. First, an error may be plain under existing law, which means that the plainness of the error is predicated upon legal principles that the litigants and trial court knew or should have known at the time of the prosecution. Second, an error may be plain because of a new legal principle that did not exist at the time of the prosecution, *i.e.,* 'the error was unclear at the time of trial; however, it becomes [plain] on appeal because the applicable law has been clarified.'"

*Id*. (footnote and citation omitted).

In the instant case, the error was plain under "legal principles that the litigants and trial court knew or should have known at the time of the prosecution." *See* W. Va. R. Evid. 404(a)(2)(C); *see also Neuman*, 179 W. Va. at 582, 371 S.E.2d at 79 (and authorities cited therein). In this regard, our law is consistent with that developed under Rule 404(a)(2)(C) of the Federal Rules of Evidence, which is identical to our Rule 404(a)(2)(C):

> The judge may allow the prosecutor to introduce evidence of the victim's character after the defense has introduced evidence of the victim's character. In addition the prosecutor can introduce character evidence in two other circumstances. First, in a homicide case in which the defense introduces evidence showing victim was the first aggressor, the prosecution can introduce evidence of the victim's character for "peacefulness." Second, when the defense attacks the character of the victim, the prosecutor can introduce evidence of the defendant's character under the "tit-for-tat" exception[.]

22B CHARLES ALAN WRIGHT & ARTHUR B. MILLER, FEDERAL PRACTICE AND PROCEDURE § 5239 (2d ed. 2024) (pertaining to the character of the victim).

13

Here, the State opened the character floodgates in its opening statement, before defense counsel had a chance to speak a word, let alone question a witness. Thereafter, the State asked its witnesses dozens of questions designed to elicit sympathy for the victim – a good person, a goofy guy, a great friend, a funny guy, a hard worker – and sympathy for his orphaned child, left with no memories of his loving, devoted father. Finally, the State reminded the jury that this case had been, from the start, about the *victim*, not about the petitioner; "[T]his case is more about [the victim] . . . And I want to remember him much more than I want to give undue attention to [the petitioner]." At no time before or during the trial did the petitioner claim that he had shot the victim in self-defense, that the victim had provoked the shooting, or that the victim had been the aggressor in a confrontation. Rather, his defense was that the State had failed to prove that the shooting "couldn't have been an accident,"[11] a defense that most certainly did not bring the victim's character into play.[12] *See supra* note 10.

---

[11] The circuit court gave the jury an instruction dealing with the defense of accident.

[12] We need not decide whether any of this evidence could have been admissible had the petitioner's trial been a unitary proceeding in which the jury was charged with determining whether or not to grant mercy in the event of a conviction of first-degree murder.

14

Accordingly, we find that the State's constant references to the victim's character, and its introduction of wholly inadmissible evidence as to that character, constituted error that was plain.

**The error affected the petitioner's substantial rights**. It is a foundational principle of our system of justice that "[t]he jury's sole function in a criminal case is to pass on whether a defendant is guilty as charged based on the evidence presented at trial and the law as given by the jury instructions." *State v. Guthrie*, 194 W. Va. 657, 664, 461 S.E.2d 163, 170 (1995). For this reason, courts must scrupulously guard against the interjection of irrelevant, immaterial, and/or unduly prejudicial evidence that could distract the jury from its sole function or unfairly influence its determination of guilt or innocence. In the instant case, we have found that the State's determined focus on the good character of the victim, rather than on the guilt or innocence of the petitioner, was plain error. That is not the end of our inquiry, however, as plain error should only be invoked where the error affected a defendant's substantial rights, meaning that "the error was prejudicial and not harmless." *State v. LaRock*, 196 W. Va. 294, 316, 470 S.E.2d 613, 635 (1996) (citing *Miller*, 194 W. Va. at 18, 459 S.E.2d at 120).

In this regard, we have held that

> [i]n determining whether the assigned plain error affected the "substantial rights" of a defendant, the defendant need not establish that in a trial without the error a reasonable jury would have acquitted; rather, the defendant need only

15

> demonstrate the jury verdict in his or her case was actually affected by the assigned but unobjected to error.

Syl. pt. 3, *State v. Marple,* 197 W. Va. 47, 475 S.E.2d 47 (1996). Generally speaking, this determination requires a reviewing court to evaluate the strength of the State's evidence separate and apart from the evidentiary error at issue in the case. *See, e.g*., Syl. Pt. 3, *State v. Kessler*, 248 W. Va. 289, 888 S.E.2d 789 (2023) ("'Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.' Syllabus Point 2, *State v. Atkins*, 163 W. Va. 502, 261 S.E.2d 55 (1979).").

First, we cannot agree with the State's assertion that the evidence to support the petitioner's conviction of second-degree murder was overwhelming. The evidence that the petitioner shot and killed the victim was, for all intents and purposes, uncontested; however, evidence of malice and/or intent on the petitioner's part was meager at best. In this regard, it will be recalled that the petitioner left the house first and was walking away when the victim caught up with him – not the other way around. There was no evidence whatsoever of what, if anything, transpired or was said in the brief seconds which elapsed

16

between the victim's action in putting his arm around the petitioner's shoulders and the petitioner's action in turning and firing his weapon. Although there was evidence of a prior physical fight between the petitioner and the victim, every witness thereto testified that the fight was prearranged to take place with others present to watch and record it. Thereafter, the combatants sat down together to smoke a cigarette and watch themselves on the video. Indeed, every witness testified that by all appearances the fight resolved whatever the underlying disagreement had been. Additionally, the evidence at trial was disputed as to whether the victim was present during the meeting which led to the petitioner's expulsion from the apartment, with one witness saying that he was and another saying that he was not. And, in any event, there was no evidence that the victim was a participant in the meeting or otherwise played any part in accusing the petitioner of theft or asking him to leave. Finally, although there was evidence that at the time he was apprehended the petitioner was trying to arrange transportation out of town, the circuit court correctly instructed the jury that "evidence of flight by the defendant is competent, along with other facts and circumstances, on the defendant's guilt, but the jury should consider any evidence of flight with caution since such evidence has only a *slight tendency* to prove guilt." (Emphasis added). *See State v. Payne*, 167 W. Va. 252, 267, 280 S.E.2d 72, 81 (1981) (designating the above as a "proper cautionary instruction").

Nonetheless, because the petitioner does not challenge the sufficiency of the evidence to support his conviction, we turn to the question of whether the error in this case was harmless. After a careful examination of the appendix record, including the trial

17

transcript, we conclude that it was not. This is not a case where there were brief, isolated instances in which inadmissible evidence of the victim's character was admitted; rather, the State announced at the outset of the trial that its focus would be on the victim's character, proceeded accordingly with extensive questioning of witnesses on this subject, and finally reminded the jury during its closing argument that "this case is more about Dylan, and . . . I want to remember him much more than I want to give undue attention to [the petitioner][.]" In short, given the sheer volume of inadmissible evidence introduced at trial, together with the State's laser focus on that evidence during its opening statement and closing argument, this is not a case where this Court can invoke harmless error as a "magic wand that seemingly makes all [error] disappear[.]" *See Edwin W. v. Mutter*, No. 21-0419, 2023 WL 356199, at *3 (W. Va. Jan. 23, 2023) (memorandum decision) (Wooton, J., dissenting).

Accordingly, we find that the State's constant references to the victim's character, and its introduction of wholly inadmissible evidence as to that character, adversely affected the petitioner's substantial rights.

**The error seriously affected the fairness, integrity, or public reputation of the judicial proceedings.** This Court has noted that "[h]istorically, the 'plain error' doctrine "authorizes [an appellate court] to correct only 'particularly egregious errors' . . . that 'seriously affect the fairness, integrity or public reputation of judicial proceedings[.]" *Miller*, 194 W. Va. at 18, 459 S.E.2d at 129 (citing *United States v. Young,* 470 U.S. 1, 15

18

(1985)); *see also* Syl. Pt. 5, *State v. Wilson*, 190 W. Va. 583, 439 S.E.2d 448 (1993) ("'"The plain error doctrine contained in Rule 30 and Rule 52(b) of the West Virginia Rules of Criminal Procedure is identical. It enables this Court to take notice of error, including instructional error occurring during the proceedings, even though such error was not brought to the attention of the trial court. However, the doctrine is to be used sparingly and only in those circumstances where substantial rights are affected, or the truth-finding process is substantially impaired, or a miscarriage of justice would otherwise result." Syllabus Point 4, *State v. England,* 180 W. Va. 342, 376 S.E.2d 548 (1988).' Syl. Pt. 6, *State v. Collins,* 186 W. Va. 1, 409 S.E.2d 181 (1990)."). Without question, this is a very high standard, as evidenced by this Court's frequent references to how "sparingly" the doctrine of plain error is to be utilized. *See Wilson*, 190 W. Va. at 584, 439 S.E.2d at 449.

Nonetheless, we find that the error in this case – the State's strategy in encouraging the jury to compare the character of the petitioner, who was depicted as a moocher and a thief, with the character of the victim, who was depicted as a veritable saint whose death was a loss to the entire community – posed a significant threat to the jury's ability to fairly and impartially determine the guilt or innocence of the petitioner. With certain exceptions carefully delineated by our rules of evidence, the laws of this State make no distinction between crimes committed against upstanding citizens and those committed against reprobates; to hold otherwise would be to create a two-tier system of justice antithetical to the equal protection guarantees of article III, section 10 of the West Virginia

19

Constitution.[13] Further, although the petitioner does not raise this as a separate assignment of error, this Court cannot overlook the prosecutor's statement to the jury that "[m]y client or clients are the people of Marion County, *each one of you. . . . I'm representing each one of you and all of our friends and all of our neighbors and all of our associates, coworkers, everyone*." (Emphasis added). In short, the prosecutor suggested that he, the jurors, and the people of Marion County were all on Team Dylan, and thus a conviction would be a victory for every single citizen of Marion County rather than an impartial determination of whether the petitioner's guilt had been proved beyond a reasonable doubt. Based on the record in its entirety, we conclude that the error in this case seriously affected the fairness, integrity, or public reputation of the judicial proceedings.[14]

In summary, we conclude that the sheer volume of testimony and argument concerning the character of the victim, which had no relevance whatsoever to the question of the petitioner's guilt or innocence of second-degree murder, cannot be deemed harmless.

---

[13] *See, e.g.*, Syl. Pt. 4, *Israel ex rel. Israel v. W. Va. Secondary Sch. Activities Comm'n*, 182 W. Va. 454, 455, 388 S.E.2d 480, 481 (1989) ("West Virginia's constitutional equal protection principle is a part of the Due Process Clause found in Article III, Section 10 of the West Virginia Constitution.").

[14] We reject the State's suggestion that all of the foregoing was harmless because the jury did not find the petitioner guilty of first-degree murder, as the prosecutor had urged it to do. On this record there is only one possible conclusion to be drawn; the jury recognized that there was not a scintilla of evidence to support a finding of premeditation.

Therefore, application of plain error analysis is appropriate and mandates reversal of the petitioner's conviction.

### Admissibility of the Petitioner's Statements to Police

Although we have reversed the petitioner's conviction on the ground that the improper admission of voluminous character evidence concerning the victim constituted plain error, we will nonetheless address the petitioner's second issue now rather than require fruitless re-litigation at a later time.

The petitioner contends that his statements given to police at the police station, after he had previously invoked his right to silence at Sheetz, were inadmissible. The evidence at trial showed that police found the petitioner at Sheetz after several hours of searching for someone matching his description: a tall young man with long blue hair on top of his head, wearing a distinctive jacket and carrying a distinctive backpack.[15] At Sheetz, police asked the petitioner about the shooting and he said something to the effect of "what gun?" or "there's no gun" or "I don't have a gun." The petitioner was given his *Miranda* rights and invoked his right to silence,[16] after which the police did not ask any

---

[15] As noted *supra*, the petitioner had hidden the jacket and backpack, as well as a pair of boots, long before he went to Sheetz; however, his height (6'4"), youth, hair style, and hair color were sufficient descriptors to make him easily identifiable.

[16] At Sheetz, the petitioner invoked only his right to silence, not his right to counsel. *See* discussion *infra*.

21

more questions until after he had been arrested and transported to the police station. At the station, a different officer from the one who read the petitioner his Miranda rights at Sheetz read him his rights again, and the petitioner signed a waiver thereof. He spoke casually with the officers while they did powder residue tests and answered a few questions pertaining to the shooting – admitting that he knew some individuals at the scene of the shooting, again denying that he had a gun or knew anything about a gun – before invoking his right to counsel, at which point questioning ceased.

In its ruling on the petitioner's motion to suppress any statements given by the petitioner at the station, the circuit court held that he had executed a valid waiver of his *Miranda* rights, that his statements were freely and voluntarily given, that there was no coercion or duress applied, and that the statements were therefore admissible. On appeal, the petitioner contends that the statements were inadmissible pursuant to *Michigan v. Mosley*, 423 U.S. 96 (1975), where the United States Supreme Court held that

> A reasonable and faithful interpretation of the Miranda opinion must rest on the intention of the Court in that case to adopt "fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored[.]" The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda

on whether his "right to cut off questioning" was "scrupulously honored."

*Id.* at 103-04 (citations and footnote omitted). In the instant case, the petitioner argues that because he was given *Miranda* warnings at Sheetz and invoked his right to silence, the police could not "try again" at the station; "[t]to permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned." *Id.* at 102. In this regard, the petitioner notes that in *Mosley*, where admission of the defendant's statements was ultimately upheld, there was an interval of two hours between interrogations, and the second interrogation was about a different crime. Here, in contrast, there was only a thirty-minute interval between questioning at Sheetz and questioning at the station, and the second interrogation was about the same crime.

We agree that *Mosley*, standing alone, provides significant support for the petitioner's argument that once he had invoked his right to silence at Sheetz, the police failed to "scrupulously honor[]" that right when they sought to interview the petitioner thirty minutes later at the station. *Mosley*, 423 U.S. at 104. But *Mosley* does not stand alone; in the fifty years which have elapsed since that case was decided, courts have shifted their analytical focus away from a suspect's invocation of the Fifth Amendment right to silence and toward his or her invocation of the Sixth Amendment right to counsel. *See, e.g.*, *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) ("[A]dditional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his

23

right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversation with the police."); *see also* Syl. Pt. 1, in part, *State v. Green*, 172 W. Va. 727, 729, 310 S.E.2d 488, 490 (1983) ("Once a suspect in custody has expressed his clear, unequivocal desire to be represented by counsel, the police must deal with him as if he is thus represented. Thereafter, it is improper for the police to initiate any communication with the suspect other than through his legal representative, even for the limited purpose of seeking to persuade him to reconsider his decision on the presence of counsel.").

Additionally, even if our focus here remains solely on the petitioner's invocation of his right to silence, *Mosley* does not establish a bright-line rule mandating suppression under the facts and circumstances of this case. As the United States Court of Appeals for the Fourth Circuit has noted, a "'significant period of time' was defined in *Mosley* as 'a function of to what degree the police 'persist[ed] in repeated efforts to wear down [an individual's] resistance and make him change his mind[,]'" *see Weeks v. Angelone*, 176 F.3d 249, 268 (4th Cir. 1999), and this period of time has "no durational minimum." *Id*. Here, police officers made no attempt to further question the petitioner at Sheetz or while they transported him to the police station. At the station, the petitioner was

24

advised of his *Miranda* warnings in writing, by a police officer who was unaware of his previous invocation of rights at Sheetz. The petitioner executed a written waiver of *Miranda* rights and chatted with officers quite casually during processing. The tape recording of the interview at the station conclusively establishes that there was no coercion, no threats, no raised voices – nothing that could be characterized as the officers "persisting in repeated efforts to wear down [the petitioner's] resistance and make him change his mind." *Mosley*, 423 U.S. at 105-06. Indeed, the moment the officers' questioning focused on the facts and circumstances of the shooting, the petitioner did in fact change his mind and invoke his right to counsel, at which point all questioning ceased.

In summary, based on the totality of the circumstances in this case, we conclude that the circuit court's findings of fact were well within the broad ambit of its discretion and that the court's conclusions of law were wholly consistent with this Court's precedents. Under the facts and circumstances of this case, the petitioner's rights were not violated when he was given *Miranda* warnings at the station; his written *Miranda* waiver was freely and voluntarily executed; his statements during the interview were not the product of duress or coercion; and his subsequent invocation of his right to counsel was honored.[17] Therefore, we find no error in the court's decision finding the petitioner's statements admissible in evidence.

---

[17] Inasmuch as the petitioner's conviction has been reversed on another ground, and the case remanded for a new trial, we need not consider his claim that cumulative error prevented him from receiving a fair trial.

## CONCLUSION

For the reasons set forth herein, the judgment of the Circuit Court of Marion County is reversed, and the case is remanded to that court for a new trial.

Affirmed in Part;
Reversed in Part; and
Remanded With Directions